JAMES ROYALS, *Plaintiff in Error*, v. THE STATE OF
FLORIDA, *Defendant in Error*.

Opinion Filed April 19, 1917.

1. In a criminal prosecution where the defendant interposes a
   challenge to the array of jurors, on the ground of unlawful
   discrimination in their selection or empaneling, on account of
   race, color or previous condition of servitude, the burden of
   proof is upon him to establish the charge.

2. A challenge to the array of jurors on the ground of unlawful
   discrimination in their selection by the County Commissioners,
   is a serious charge, involving not only dereliction of duty, but
   violation of the Constitution of the United States, and such
   a charge in a matter in which the law presumes they legally
   discharged their duty, "should be duly, properly, directly and
   distinctly alleged, and if not admitted by demurrer or other-
   wise," should be proven by very strong and convincing testi-
   mony of witnesses of intelligence and unimpeachable integ-
   rity.

3. The decision of the trial judge rendered after hearing the
   testimony, on issue joined on a challenge to the array of
   jurors on the ground of unlawful discrimination in their
   selection or empaneling, will not be disturbed unless the
   record discloses a condition from which this court can infer
   that he did not give the matter proper consideration.

Writ of Error to Circuit Court of Record for Duval
County; Jas. M. Peeler, Judge.

Judgment reversed.

*W. H. Thompson* and *I. L. Purcell,* for Plaintiff in
Error;

*T. F. West*, Attorney General, and *C. O. Andrews*,
Assistant, for the State.

BROWNE, C. J.—Jim Royals, a negro, was convicted in the Criminal Court of Record for Duval County, of the crime of assault with intent to commit rape on a negro girl, and asks a reversal on grounds set out in his assignment of errors.

The first error complained of is the denial of the defendant's challenge to the array of petit jurors, on the ground that the County Commissioners of Duval County in selecting names of persons to do jury duty discriminated against all colored men of African descent, solely on account of their race, color and previous condition of servitude. This question has been before this court on several occasions, and fully discussed in those cases. See Montgomery v. State, 53 Fla. 115, 42 South. Rep. 894; Montgomery v. State, 55 Fla. 97, 45 South. Rep. 879; Bonaparte v. State, 65 Fla. 287, 61 South. Rep. 633; Haynes v. State, 71 Fla. 585, 72 South. Rep. 180. In the case in the 53rd Florida there was a demurrer to the challenge, and this court held that the allegations in the challenge which the demurrer admitted to be true, were sufficient to show discrimination. In the case in the 55th Florida the State joined issue on the challenge, and the defendant introduced evidence in support of his allegations, and no testimony was offered in rebuttal by the State. It was held that the defendant had proven his challenge, and the same was overruled. In the case in the 65th Florida, there was a joinder of issue on the challenge, and the defendant supported it by testimony. The State called only one witness, a deputy sheriff, who testified that he had not discriminated against negroes in serving the venire. This case was reversed by a divided court of three to two, because the trial judge sustained the State's objection to a question asked this witness by the defendant on cross-examination. The Haynes case, 71

Fla. 585, 72 South. Rep. 180, was decided on the ground that the testimony did not sustain the allegations of the challenge.

In a criminal prosecution where the defendant interposes a challenge to the array of jurors, on the ground of unlawful discrimination in their selection or impaneling, on account of race, color or previous condition of servitude, the burden of proof is upon him to establish the charge.

The offense charged against the County Commissioners is a serious one, involving not only a dereliction of duty, but a violation of the Constitution of the United States, and such charge in a matter in which the law presumes they legally discharged their duty, "should be duly, properly, directly and distinctly alleged; and if not admitted by demurrer or otherwise," should be proven by very strong and convincing testimony of witnesses of intelligence and unimpeachable integrity. In this as in other matters where the trial judge has the witnesses before him, he can better judge of their character, their veracity, their interest and their manner of testifying, than can this court, and unless the record discloses a condition from which this court can infer that he did not give the matter proper consideration, his decision will not be disturbed.

In this case the State joined issue on the challenge, and the defendant called three witnesses: the first, Deputy Sheriff Plunk, testified that he had been deputy sheriff about twenty-seven years, and could not remember seeing any colored men on the jury; that he hadn't taken any particular notice in the last ten years, whether he had seen any negroes on the jury or not; that he didn't think he had seen any in five years; that there were no negroes on the list of jurors which was handed him. Mr. R. C.

Ingram had been Clerk of the Criminal Court of Record for Duval County seven years, but not continuously. He could not answer whether he had seen negroes on the jury, or whether any "colored names" were taken out of the box, and that he didn't think any colored men had been summoned on the jury, all but one of whom had been drawn from the box for the jury duty for that week. J Horsey Smith testified that he was a physician and surgeon, and had lived in Duval County about twenty years, and had missed attending very few sessions of the Criminal Court of Duval County, and during that time he had not seen any colored men on the jury. He was asked, "state whether or not, from your knowledge of the colored people of this city and county, and taking into consideration that you have practiced medicine for a number of years, and your experience, are there any colored men in this county of improved (sic) integrity, fair character, sound judgment and intelligence and fully qualified for jury duty," to which he replied "yes, there are many hundred qualified for jury duty."

He separated his answer into two parts, answering "yes" to the question if there were *any* negroes in Duval County possessed of the superlative qualities enumerated in the question, and added what in effect was only an opinion, that "there are many hundred qualified for jury duty." That concluded the testimony in support of the challenge. We are not called on to say whether this testimony unrebutted, would have been sufficient to prove the charges made in the challenge, because the State met it with the testimony of one Mr. H. G. Perrin, one of the County Commissioners of Duval County, that he furnished about two hundred names to go into the jury box, and he did not discriminate against any negro on account of race or color. Asked on cross-examination if he knew

"if the others discriminated," he replied:  "I am only speaking for myself."

We do not think the testimony supported the challenge, and there was no error in the ruling of the trial judge in denying the challenge.

The other assignments of error relate to the ruling of the court sustaining objections to questions propounded by the defendant, which affected the credibility of the prosecutrix, and in overruling the motion for a new trial.

From the view we take of the testimony it is not necesary to discuss the assignments of error relative to the court sustaining the State's objections to questions propounded to Ray Hartley and to Charley Alexander.

Not only is the prosecutrix contradicted by several witnesses, in some instances on material matters, but her own testimony is replete with contradictions, and contains a material statement which is highly improbable, if not physically impossible; she testified that "Jim Royals met her on the boards and took her in the bushes and did nastiness to her; that he staid on her for an hour and a half." She says she had been to Mrs. Joiner's to get some okra, and was very positive and emphatic that she did not get corn, but got okra. Stella Hopkins who sent her on the errand says she got corn and not okra. Mr. Joiner says she gave her corn and not okra. The prosecutrix says she left home between eleven and twelve o'clock, walked a mile to Mrs. Joiner's, and when returning met Jim Royals who took her into the bushes and kept her there for over an hour and a half, and she then walked back home. Stella Hopkins says she sent her on the errand about one o'clock, and she got back at three. Dan Hopkins, Stella's husband, says he got back home about two o'clock and the girl was there. On cross-examination Dan Hopkins testified in part as follows:  "Q.

Do you know Charley Alexander? A. Yes, sir. Q. Do you remember seeing him at your house the Monday after Alberta had said that some one had raped her? A. Yes, sir he was there that Monday. Q. Who was there? A. Alberta Woods, myself and my wife. Q. Do you remember a conversation in which you told Alberta Woods after she had denied that Royals had harmed her and you said if she did not tell the truth you would whip her? A. I remember the conversation, but I do not remember saying I was going to whip her."

Charley Alexander testified in part as follows: "Q. Do you remember visiting the home of Alberta Woods, after this trouble? A. Yes, sir. Q: When was it? A. It was the next Monday morning after the Saturday the 24th day of July, 1915. Q. Who was present? A. Dan Hopkins, his wife, and the girl Alberta Woods. Q. Did you hear Alberta Woods say that Jim Royals did not commit the crime upon her? A. Yes, she said Pretty Boy, the son of Mr. Smith, did it; then Dan Hopkins threatened to whip her, and Dan said to her, now if you don't say Jim Royals I will whip you; and then she said Jim Royals."

The prosecutrix testified that after Jim Royals had staid on her for an hour and a half she walked a mile back home and "was laid up there three or four days and did not go out of the house." On cross-examination she was asked "Did you or did you not on Monday or Tuesday either one of those days after this happened go to his store and did not Mr. Hartley ask you about this matter, that is, did Jim Royals commit the crime upon you, and did you not tell Mr. Hartley no Jim Royals did not do anything to you?" to which she replied: "No sir I did not go to Mr. Hartley's store, I went two or three weeks after it happened."

Mr. Ray Hartley, a deputy sheriff, testified in part as follows: "Q. Do you know anything about the charge of rape against him? A. Only from investigation. Q. Was that investigation as a county officer? A. Yes. Q. From your investigation what did you find out? A. Well, this Alberta Woods came to my store the Monday or Tuesday after she said this had happened, and I asked her if it was true Jim Royals did it, she said no, he did not do it or commit any rape upon her. Q. Was she lame, or had any appearance of being sore? A. No. Q. How far would she have to come to get to your store? A. About two and a half miles."

The defendant denied committing the offense, and that he was at or near the place where the crime was said to have been committed, at any time on that day; he not only contradicted the prosecutrix' statements about his having a gun with him on that day, but swore he does not own a gun. He says he was at Mr. Smith's home from twelve until two o'clock on the day the offense was said to have been committed. Mr. Smith was not called to contradict him. In every material statement Alberta Woods was contradicted; in some instances by Jim Royals, in others by Deputy Sheriff Hartley and by Charley Alexander; and in minor matters, but which tended to show her defective memory or her veracity, she was contradicted by her own family who testified for the State.

The testimony does not support the verdict, and the judgment of the lower court is reversed.

TAYLOR, SHACKLEFORD, WHITFIELD and ELLIS, JJ., concur.